797 F.2d 227
 MARCUS, STOWELL & BEYE GOVERNMENT SECURITIES, INC.,
Plaintiff-Appellee Cross-Appellant,
v.
JEFFERSON INVESTMENT CORPORATION, et al., Defendants,
Daniel M. Andreola and the Andreola Companies, Inc.,
Defendants-Appellants Cross-Appellees.
 No. 85-2491.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 18, 1986.
 
 Michael D. Farris and Gerald R. Powell, Dallas, Tex., and Fulbright & Jaworski, Murray Fogler, Houston, Tex., for defendants-appellees cross-appellants.
 Gregory A. Bolzle and Ralph A. Midkiff, Porter & Clements, Houston, Tex., for plaintiff-appellant cross-appellee.
 Appeals from the United States District Court for the Southern District of Texas.
 Before RUBIN, POLITZ and JOHNSON, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 In this Texas tortious interference with contract action, the jury returned a verdict in favor of the plaintiff, Marcus, Stowell & Beye Government Securities, Inc. ("MSB"), and awarded $119,000.00 in actual damages as well as $150,000.00 in punitive damages. The district court deducted from MSB's recovery $65,000.00 that MSB had received in an earlier settlement agreement with a third party. The district court also refused to award MSB attorney's fees. MSB appeals from these damage determinations and also challenges the measure of recovery used by the district court. The defendants, Daniel Andreola and The Andreola Companies (collectively referred to herein as "Andreola"), have cross-appealed challenging both the imposition of liability for tortious interference and the award of punitive damages. Finding the contentions of MSB on appeal as well as those of Andreola on cross-appeal unpersuasive, we affirm the judgment of the district court.
 
 I. BACKGROUND
 
 2
 Jefferson Investment Corporation, a wholly owned subsidiary of Jefferson Savings & Loan Association (collectively referred to herein as "Jefferson"), was engaged in selling whole loans in the secondary mortgage market. In June of 1982, MSB agreed to act as broker for Jefferson's prospective sale of a portion of its mortgage portfolio. On August 9, 1982, MSB completed a written brokerage agreement with Jefferson which authorized MSB to represent Jefferson "as a loan broker" and provided that MSB would receive a one-half percent commission upon the completion of a sale. MSB located a purchaser, Commercial Federal Savings and Loan of Nebraska ("Commercial Savings"), who offered to purchase $18,149,311.00 in mortgages from Jefferson. In August of 1982, however, the proposed sale fell through when Commercial Savings discovered numerous irregularities in the Jefferson mortgage portfolio.
 
 
 3
 After the unsuccessful August sale, Jefferson revised and reorganized its mortgage portfolio to correct the irregularities which had prevented closing the sale to Commercial Savings. Jefferson again agreed to use MSB as loan broker and on October 26, 1982, executed another brokerage agreement. Unlike MSB's original brokerage agreement with Jefferson, however, the October 26 agreement authorized MSB to act as "exclusive loan broker" for Jefferson's reorganized mortgage portfolio. The agreement, which was to expire on December 17, 1982, provided that MSB would earn a one-half percent commission once it produced a purchaser and once the parties to the sale executed a commitment letter.
 
 
 4
 In November of 1982, MSB located Pacific First Federal Savings and Loan Association ("Pacific") as a prospective purchaser of Jefferson mortgages.[1] Pacific and Jefferson subsequently executed and exchanged a commitment letter which constituted Pacific's written promise to buy and Jefferson's written promise to sell approximately $15,000,000 in mortgages. However, Jefferson eventually backed out of the proposed sale to Pacific for reasons which are unclear from the record.
 
 
 5
 In the meantime and during the term of MSB's exclusive brokerage agreement, Andreola began actively soliciting purchasers for Jefferson's reorganized mortgage portfolio.[2] This solicitation was initially without written authorization from Jefferson. On December 8, 1982, however, over a week before MSB's exclusive brokerage agreement expired, Jefferson granted Andreola written authority "to solicit an offer to purchase a portion of [Jefferson's] mortgage loan portfolio." Andreola's brokerage agreement provided that Andreola would receive a one percent commission upon completion of a sale.
 
 
 6
 Prior to the expiration of the MSB/Jefferson exclusive brokerage agreement, Andreola successfully located two purchasers. Jefferson eventually completed mortgage sale transactions with both Andreola purchasers shortly after the MSB/Jefferson exclusive brokerage agreement had expired on December 17, 1982.[3] As a result, Jefferson paid Andreola a commission of $238,552.00.
 
 
 7
 MSB, disturbed by what it viewed as a violation of its exclusive brokerage agreement, filed the instant suit against both Jefferson and Andreola. MSB alleged that Jefferson had breached MSB's brokerage agreement by failing to pay MSB a commission for arranging the Pacific transaction and by dealing with Andreola in violation of MSB's exclusive brokerage authorization. MSB also alleged that Andreola had tortiously interfered with MSB's exclusive brokerage agreement with Jefferson and had breached a contract with Jefferson to pay MSB a portion of Andreola's commission, of which contract MSB was a third-party beneficiary.
 
 
 8
 Before trial, MSB and Jefferson settled their dispute and MSB dismissed its claims against Jefferson. Pursuant to the settlement, Jefferson paid MSB $65,000.00. Jefferson allocated $50,000.00 of the total $65,000.00 settlement to MSB's claim against Jefferson for failing to pay MSB a commission for locating Pacific as a buyer.
 
 
 9
 At trial the jury returned a verdict in favor of MSB on both its breach of contract and tortious interference claims against Andreola. The jury awarded MSB $119,000.00 for Andreola's tortious interference. This award was based on a finding of MSB's damages rather than a finding of Andreola's profits. The district court had refused a request by MSB that the jury be instructed to award damages based on Andreola's profits rather than MSB's damages. The jury also found that Andreola's interference was malicious and thus awarded punitive damages of $150,000.00. The jury further found that Andreola had promised Jefferson to share ten percent of its commission with MSB ($23,855.20), which promise Andreola subsequently breached.
 
 
 10
 The district court required MSB to elect recovery on either its tortious interference claim, or on its breach of contract claim. MSB elected recovery of the $119,000.00 in actual damages awarded by the jury for Andreola's tortious interference. The district court, over MSB's objection, then deducted from MSB's award the entire $65,000.00 Andreola had received in settlement from the Jefferson Company. The district court also denied MSB's request for an award of its attorney's fees. MSB filed timely notice of appeal and Daniel Andreola and The Andreola Companies cross-appealed.[4]II. MSB'S CONTENTIONS ON APPEAL
 
 
 11
 On appeal, MSB contends that the district court erred in (1) failing to instruct the jury as to an unjust enrichment measure of recovery for tortious interference; (2) deducting MSB's $65,000.00 settlement with Jefferson from MSB's recovery; and (3) refusing to award attorney's fees to MSB.
 
 
 12
 A. Measure of Damages for Tortious Interference
 
 
 13
 MSB first contends that it was entitled to recover the profits made by Andreola as a result of the tortious interference. Because Andreola received twice the commission that MSB would have received, Andreola's profits exceeded the damages suffered by MSB. The district court refused, however, to instruct the jury to award MSB those profits received by Andreola from the transaction. Instead, the district court instructed the jury to award damages based on MSB's loss. MSB contends that awarding damages based on MSB's loss was erroneous because to do so permitted the tortfeasor, Andreola, to retain a portion of the profits incurred as a result of its tortious conduct.
 
 
 14
 MSB's contention is not without some merit. Texas courts have refused in other contexts to permit a wrongdoer to profit from its wrongful conduct. See, e.g., Schwing v. Bluebonnet Express, Inc., 489 S.W.2d 279, 281 (Tex.1973) ("A beneficiary whose negligence contributed to cause the decedent's death will not be permitted to profit by his own wrong."); Kothmann v. Boley, 308 S.W.2d 1, 4 (Tex.1958) (lessors who wrongfully repudiate lessees' title will not be allowed to profit by their own wrong). Depriving a tortfeasor of its profits serves the policy of discouraging future wrongdoing while at the same time preventing the "unjust enrichment" of a wrongdoer. Recognizing the importance of these policies, several courts outside of Texas have approved, in particular circumstances, an award for tortious interference based on the defendant's profits. See National Merchandising Corp. v. Leyden, 348 N.E.2d 771 (Mass.1976).[5] See also Certified Laboratories of Texas, Inc. v. Rubinson, 303 F.Supp. 1014 (E.D.Pa.1969); Federal Sugar Refining Co. v. United States Sugar Equalization Board, Inc., 268 F. 575 (D.C.N.Y.1920).
 
 
 15
 Nevertheless, we conclude that under Texas law the district court properly measured MSB's recovery by the amount of actual loss suffered by MSB. Texas courts have observed that the aim of awarding damages for tortious interference is the same as that of awarding damages for breach of contract--that is, to place the injured party in the same economic position it would have been in had the contract not been breached. In Armendariz v. Mora, 553 S.W.2d 400, 406 (Tex.Civ.App.--El Paso 1977, writ ref'd n.r.e.), the Texas Court of Civil Appeals stated that:
 
 
 16
 The measure of damages for tortious interference with contract is the same as for breach of contract, the Court attempting to put the Plaintiff in the same economic position he would have been in had the contract not been breached. Both the breaching party and the interfering party are jointly and severally liable for the actual damages incurred by the Plaintiff. (citation deleted) (emphasis added).
 
 
 17
 See also Gulf Atlantic Insurance Co. v. Hurlbut, 696 S.W.2d 83, 101 (Tex.App.--Dallas 1985, no writ) (measure of damages for interference with contracts is the same as for breach of contract); Prowse v. Whitehurst, 313 S.W.2d 126, 130-31 (Tex.Civ.App.--San Antonio 1957, writ ref'd n.r.e.) (the measure of damages for tortious interference with contract is the same as the measure of damages for breach of contract). Thus in awarding actual damages for tortious interference, Texas courts have focused solely on compensating the injured contract party.
 
 
 18
 Limiting recovery to a plaintiff's loss, even where doing so (as in the instant case) permits the tortfeasor to retain a portion of its profits, is not without strong justification. As one commentary has concluded, "[t]here is obviously an anomaly in making the defendant liable for a greater sum than that for which the contracting party himself can be held." See Prosser & Keeton on Torts Sec. 129 at 1004 (5th ed. 1984). A contract party is permitted, or even encouraged when economically efficient, to "buy out" a contract by paying the plaintiff's actual damages. Id. (The duty to keep a contract at common law means a prediction that you must pay damages if you fail to keep the contract--and nothing else.). This is true even if making the plaintiff whole permits the breaching party to retain profits in excess of the plaintiff's loss. It would be inconsistent to require the party inducing a breach to disgorge its excess profits while permitting the breaching party to retain its excess profits.[6] Given this apparent inconsistency as well as Texas case law indicating that the measure of damages for interference with contractual relations is identical to that for breach of contract, the district court properly limited MSB's actual damage award to MSB's loss suffered as a result of the interference.
 
 
 19
 MSB contends that even if the measure of recovery used by the district court is ordinarily correct, recovery of Andreola's profits is appropriate here since the jury found that Andreola had acted with actual malice. While we agree that a finding of actual malice creates an especially strong justification for depriving the wrongdoer of any profits obtained by its course of conduct, we conclude that such a finding does not require altering the ordinary measure of actual damages. Under Texas law the jury's finding of actual malice entitled MSB to recover exemplary damages, see Clements v. Withers, 437 S.W.2d 818, 822 (Tex.1969), which it did in the amount of $150,000. Thus, where an interfering party's conduct is particularly egregious, Texas law provides a device to deprive the wrongdoer of those profits obtained by the wrongful conduct. We note that in the instant case, the jury's award of $119,000 in actual damages when combined with the $150,000 punitive damage award deprived Andreola of an amount in excess of the full commission received as a result of its contract with Jefferson.
 
 B. Credit for the Jefferson Settlement
 
 20
 MSB also contends that the district court erred in crediting Andreola for the entire $65,000.00 settlement MSB received from Jefferson. According to MSB, it had two separate and distinct breach of contract claims against Jefferson, one for failing to pay a commission on the Pacific transaction and the other for entering into a contract with Andreola. MSB contends that Andreola was jointly and severally liable only on the latter claim, and thus was entitled at most to credit for the $15,000.00 settlement attributable to that claim. MSB's contention must be rejected.
 
 
 21
 Under the Texas one satisfaction rule, "an injured party is entitled to but one satisfaction for a single injury, so that an amount received in settlement from one [defendant] must be applied as a credit reducing the amount to be recovered against other defendants." Gill v. United States, 429 F.2d 1072, 1079 (5th Cir.1970); Riley v. Industrial Finance Service Co., 302 S.W.2d 652, 655 (Tex.1957). The one satisfaction rule is based on the notion that allowing a double recovery is ordinarily against legal policy.
 
 
 22
 Although Jefferson was alleged to have breached its contract with MSB in two ways, the district court could properly conclude that MSB suffered only a single injury--the loss of a commission to be earned by locating a purchaser for Jefferson's mortgage portfolio. Recovery of an amount equal to that commission would place MSB in the same position as if its contract had never been breached. Jefferson, as the breaching party, and Andreola, as the party inducing the breach,[7] were jointly and severally liable under Texas law for MSB's single injury. See Armendariz v. Mora, 553 S.W.2d 400, 406 (Tex.Civ.App.--El Paso 1977, writ ref'd n.r.e.) ("Both the breaching party and the interfering party are jointly and severally liable for the actual damages incurred by the plaintiff."); D. Dobbs, Remedies Sec. 6.4 at 464 (1973) ("to the extent that the plaintiff first recovers a judgment against the contract breaker, and gets it satisfied, he should be barred from claiming those damages from the tortfeasor.").
 
 
 23
 In these circumstances, failure to deduct the entire amount of MSB's settlement with Jefferson would place MSB not in the same position as if the interference had not occurred, but in a better position. As such, the district court properly applied the one satisfaction rule to credit Andreola for MSB's entire settlement with Jefferson.
 
 C. Attorney's Fees
 
 24
 MSB's final contention on appeal is that the district court erred in refusing to award MSB attorney's fees. MSB relies on Tex.Rev.Stat.Ann. art. 2226 (Vernon Supp.1985) (repealed),[8] which authorizes recovery of attorney's fees in "suits founded on oral or written contracts." According to MSB, article 2226 authorizes recovery of attorney's fees in tortious interference cases because the existence of a contract is a prerequisite to recovery in such cases.
 
 
 25
 As a general rule, however, attorney's fees are not recoverable in Texas tort actions absent a specific statutory provision to the contrary. See American National Bank v. First Wisconsin Mortgage Trust, 577 S.W.2d 312, 319 (Tex.Civ.App.--Beaumont 1979, writ ref'd n.r.e.); Zummo Cattle Co. v. Millard, 482 S.W.2d 17, 23 (Tex.Civ.App.--Tyler 1972, writ ref'd n.r.e.). Several Texas courts have specifically concluded that article 2226 does not apply in tort actions. See Ryan v. Mo-Mac Properties, 644 S.W.2d 791, 794 (Tex.App.--Corpus Christi 1982, writ ref'd n.r.e.) (article 2226 does not apply in an action for slander of title); see also Fowler v. One Seguin Art Center, 617 S.W.2d 763 (Tex.Civ.App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.) (no recovery of attorney's fees is authorized by article 2226 where the action is in negligence); Olin Corp. v. Cargo Carriers, Inc., 673 S.W.2d 211, 217 (Tex.App.--[14th Dist.] 1984, no writ). In addition, this Court, in applying Texas law, has concluded that article 2226 does not encompass claims based on fraudulent inducement to contract. See Neeley v. Bankers Trust Company, 757 F.2d 621, 634 (5th Cir.1985).
 
 
 26
 We are aware of no Texas authority which has approved an award of attorney's fees where the plaintiff has recovered solely on a tortious interference with contract claim. In Bellefonte Underwriters Insurance Co. v. Brown, 663 S.W.2d 562 (Tex.App.--Houston [14th Dist.] 1983, aff'd in part, rev'd in part, 704 S.W.2d 742 (Tex.1986)), relied upon by MSB, the Texas Court of Appeals affirmed an award of attorney's fees where the plaintiff had sued on both breach of contract and tortious interference claims. However, the plaintiff recovered only on the breach of contract claim and failed to establish tortious interference with contract. See Bellefonte Underwriters Insurance Co. v. Brown, 704 S.W.2d 742, 745 (Tex.1986). Thus, Bellefonte offers no support for MSB's contention. Given the lack of direct authority supporting an award of attorney's fees on a tortious interference claim as well as that authority declining to award attorney's fees in tort actions, even where the tort action arises out of a contractual relation, we agree with the district court that article 2226 does not authorize recovery of attorney's fees in tortious interference suits.
 
 
 27
 The district court also properly determined that MSB was not entitled to an award of attorney's fees based on MSB's breach of contract claim against Andreola. Attorney's fees were an element of recovery authorized by article 2226 in connection with MSB's breach of contract claim. MSB elected, however, to pursue its tort rather than contract claim to judgment. Consequently MSB neither recovered on its contract claim nor obtained a judgment on that claim.
 
 
 28
 Prior to being amended in 1977, article 2226 expressly required that a party seeking attorney's fees must first "obtain judgment" on his claim. If a party obtained judgment, he could recover "in addition to his claim" a reasonable amount as attorney's fees. As amended in 1977, article 2226 no longer expressly requires that a party seeking attorney's fees first "obtain judgment." Article 2226 now provides that if a party has a "just amount owing," he may "recover in addition to his claim and costs, a reasonable amount as attorney's fees."
 
 
 29
 The Texas Supreme Court recently discussed the effect of the 1977 amendment's deletion of the requirement that a party first "obtain judgment" to recover attorney's fees. After stating that a claimant need only establish a "just amount owing," the court in McKinley v. Drozd, 685 S.W.2d 7, 10 (Tex.1985), stated that "a favorable trial court judgment on the article 2226 claim is needed to establish that the claim is 'just'...." The court concluded that a favorable judgment on a claim within the scope of article 2226 justified an award of attorney's fees even in the absence of a net monetary recovery.
 
 
 30
 The language in McKinley indicating that a favorable judgment is required under article 2226 even after the 1977 amendment is arguably dicta.[9] Nevertheless, we are aware of no Texas case approving an award of article 2226 attorney's fees in the absence of either a judgment or some recovery, either monetary or otherwise, on an article 2226 claim.[10] In McKinley, the plaintiff had in fact recovered on an article 2226 claim, even though that recovery was entirely offset by an opposing party's claim. Similarly, in Barksdale v. Hailey, 624 S.W.2d 733 (Tex.App.--Fort Worth 1981, writ ref'd n.r.e.), relied upon by MSB, the plaintiff obtained relief (specific performance) on its article 2226 claim, even though that relief was nonmonetary. Article 2226 appears to anticipate recovery on an article 2226 claim as a prerequisite to an award of attorney's fees. Given MSB's election to forego recovery on its article 2226 claim by not pursuing that claim to judgment, we conclude that MSB also elected to forego recovery of attorney's fees under article 2226.[11]
 
 III. ANDREOLA'S CONTENTIONS ON CROSS-APPEAL
 
 31
 On cross-appeal, Andreola contends (1) that any interference was justified as a matter of law, and (2) that there was no evidentiary support for the jury's award of punitive damages. We disagree with both contentions.
 
 A. Justification
 
 32
 To establish tortious interference with contract, a plaintiff must show (1) the existence of a contract subject to interference; (2) that the act of interference was knowing and intentional; (3) that such interference was a proximate cause of plaintiff's damage; and (4) that actual damage or loss occurred. Armendariz v. Mora, 553 S.W.2d 400, 404 (Tex.Civ.App.--El Paso 1977, writ ref'd n.r.e.). Even when the above four elements are established, however, the existence of privilege or justification for the interference will defeat the action. Sakowitz, Inc. v. Steck, 669 S.W.2d 105, 107 (Tex.1984).
 
 
 33
 The jury found that Andreola had tortiously interfered with MSB's exclusive brokerage agreement by soliciting potential buyers and signing a brokerage agreement with Jefferson before MSB's exclusive agreement had expired. On appeal, Andreola asserts that its conduct was justified as a matter of law. Andreola contends that its conduct constituted no more than the exercise of legal rights granted by its contract with Jefferson. That contract, executed on December 8, 1982, authorized Andreola "to solicit an offer to purchase a portion of [Jefferson's] mortgage loan portfolio." Relying on White v. Larson, 586 S.W.2d 212 (Tex.Civ.App.--El Paso 1979, no writ), Andreola concludes that justification exists whenever a party acts pursuant to a contractual right.
 
 
 34
 Andreola's reliance on White is misplaced. In White, two brokers had executed successive exclusive agency agreements to sell a parcel of realty, the first to expire on December 31, 1974, and the second to begin on January 10, 1975. Each broker was entitled by contract to a sales commission for a sale completed after the broker's exclusive agency had expired where the broker was "the procuring cause of such sale." The property was sold after the initial brokerage agreement had expired, but to a purchaser that had been located during the term of the initial brokerage agreement by the initial broker. After the seller paid a commission to the initial broker, the subsequent broker sued for tortious interference with contract.
 
 
 35
 The Texas Court of Civil Appeals concluded that the initial broker's conduct was justified as a matter of law. The court noted that the initial broker was merely exercising its contractual right to complete a sale begun during the term of its exclusive agency. The court stated that "where a party had a contractual right to do the very thing about which complaint was made, there was a legal right or justification and no cause of action would arise out of such conduct." Id. at 215.
 
 
 36
 The foregoing rule is not, however, without limitation. A party cannot by contract justify a knowing and intentional interference with a valid, preexisting contractual right. See Prosser & Keeton on Torts Sec. 129 at 986 (5th ed. 1984) (defendant permitted to interfere with another's contractual relations to protect a prior contract of his own); Carpenter, Interference With Contract Relations, 41 Harv.L.Rev. 728, 747 (1928). Otherwise, third parties could interfere with existing contractual relations with impunity simply by first contracting to engage in the tortious conduct.
 
 
 37
 In White, the defendant was acting pursuant to a valid contractual right which antedated the contractual right allegedly interfered with. As a matter of law, the defendant's conduct was justified. The Andreola/Jefferson brokerage agreement, in contrast, postdated MSB's exclusive brokerage agreement. To the extent Andreola's agreement authorized conduct which interfered with the existing MSB exclusive brokerage agreement, it could not legally "justify" that interference. The district court did not, therefore, err in refusing to rule that Andreola's conduct was justified as a matter of law.[12]
 
 
 38
 In the alternative, Andreola contends that the district court erred in refusing to submit the following proposed instruction to the jury:
 
 
 39
 You are further instructed that in order for Andreola to be liable for interference, his conduct must be without right or justification. A person is legally justified to do an act if he has a valid contractual right of his own to do it. In this case, Andreola claims that his actions were committed in the good faith performance of his contract with the Jefferson Companies. If you find from a preponderance of the evidence that that is so, you will answer special interrogatory No. 1, "No". On the other hand, if you find from a preponderance of the evidence that Andreola intentionally and knowingly induced the Jefferson Companies to give him the contractual right to sell the loans in order to interfere with MSB's pre-existing contractual rights, Andreola's conduct is not justified, and you will answer special interrogatory No. 1, "Yes".
 
 
 40
 Record Vol. III at 570. According to Andreola, evidence that it was acting pursuant to contractual right and without "knowledge" of the existence of MSB's contract created a fact issue regarding the existence of legal justification which should have been submitted to the jury. As noted above, however, Andreola's brokerage contract could not justify interfering with MSB's preexisting exclusive contract.
 
 
 41
 The lack of knowledge of MSB's exclusive brokerage agreement would have exonerated Andreola from liability for tortious interference. The jury was specifically instructed, however, that Andreola's conduct must have been with knowledge of MSB's contract. The jury apparently found, and could have properly found based on the evidence introduced at trial, that Andreola knew or should have known of MSB's exclusive contract. We conclude, therefore, that Andreola's claim to the contrary is without merit.
 
 B. Punitive Damages
 
 42
 At the close of trial, Andreola moved for an instructed verdict on the issue of punitive damages citing an alleged complete lack of any evidence of malice or ill will. The district court denied Andreola's motion and instead submitted the punitive damages issue to the jury. In response to special interrogatories, the jury found that Andreola's interference with MSB's exclusive brokerage agreement was malicious and awarded $150,000.00 in punitive damages. On appeal, Andreola asserts that the district court erred in submitting the punitive damages issue to the jury.
 
 
 43
 Our standard of review on this issue is limited. A party is entitled to a directed verdict only "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict...." Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc). In evaluating the evidence, the Boeing standard requires this Court to "consider all the evidence and in the light and with all reasonable inferences most favorable to the nonmover." Thornton v. Gulf Fleet Marine Corp., Inc., 752 F.2d 1074, 1076-77 (5th Cir.1985). Applying the Boeing standard, this Court concludes that the district court did not err in denying Andreola's motion for a directed verdict.
 
 
 44
 Under Texas law, in an action for tortious interference with contract a party seeking punitive damages must establish either "actual malice" or that the defendant's acts were accompanied by fraud or other aggravating circumstances. Actual malice, as distinguished from "legal malice," requires a showing of "ill-will, spite, evil motive or purposing the injury of another." Clements v. Withers, 437 S.W.2d 818, 822 (Tex.1969) (citing Kidd v. Hoggett, 331 S.W.2d 515, 518 (Tex.Civ.App.--San Antonio 1959, writ ref'd n.r.e.)). As in other instances which require proof of the wrongdoer's state of mind, the requisite state of mind can properly be inferred from the acts and conduct of the wrongdoer. See Chandler State Bank v. Dorsey, 618 S.W.2d 113, 116 (Tex.Civ.App.--Tyler 1981, no writ).
 
 
 45
 Roy Kavanaugh, who represented MSB in its dealings with Jefferson, testified that he initially met Daniel Andreola at an August 9, 1982, meeting to discuss the proposed Jefferson/Commercial Savings transaction.[13] At this meeting, Kavanaugh informed Andreola of MSB's brokerage agreement with Jefferson and provided Andreola with a copy of that agreement. Andreola assured Kavanaugh that he had no intention of "going around" MSB to deal directly with Jefferson, Record Vol. VII at 23, 94, and that it was therefore unnecessary for Kavanaugh to secure a "noncircumvention" agreement. Record Vol. VII at 72. Almost immediately after assuring Kavanaugh that he had no intention of "going around" MSB, Andreola directly contacted Jefferson to offer his services as a broker. Later, when confronted with MSB's exclusive brokerage agreement during the first week of December 1982, Record Vol. VII at 54, 76, Andreola advised Jefferson "that as far as he was concerned this was a new deal and that [MSB] might be entitled to some sort of a finder's fee, but that was it." Record Vol. VII at 54. Andreola nevertheless promised Jefferson officials to "take care of" his moral obligation to pay MSB a percentage of the commission, but later refused to do so. From the foregoing evidence,[14] the jury could have found that Andreola's conduct was sufficiently egregious, see Clements, 437 S.W.2d at 822 (recognizing relevance of fraudulent conduct in awarding exemplary damages in a tortious interference action), that Andreola should be required to pay punitive damages.[15]
 
 IV. CONCLUSION
 
 46
 For the foregoing reasons, the judgment of the district court is
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 After MSB located Pacific, Jefferson modified MSB's exclusive brokerage agreement on November 8, 1982, to provide for a full one percent commission. This modification was made to permit MSB to split its commission with a broker representing Pacific
 
 
 [2]
 Andreola began soliciting purchasers for Jefferson as early as November 23, 1982, several weeks after MSB had secured exclusive brokerage authorization and several weeks before that authorization was due to expire
 
 
 [3]
 Saloman Brothers was one of the two purchasers located by Andreola. Evidence was presented during trial from which the jury could conclude that the Saloman Brothers transaction, arranged by Andreola, influenced Jefferson's decision not to go through with the Pacific deal. See Record Vol. VIII at 191-99. Andreola testified that after finalizing the Saloman Brothers deal, William Moore, a representative of Jefferson, "pulled the [Pacific] commitment letter out of his briefcase and said we don't need to worry about this anymore." Record Vol. VIII at 198-99
 
 
 [4]
 Prior to oral argument, this Court was notified that Daniel Andreola had filed for bankruptcy. Daniel Andreola's filing requires this Court to examine the effect of the automatic stay provision contained in 11 U.S.C. Sec. 362 on MSB's appeal and on the cross-appeal of Daniel Andreola and The Andreola Companies. The well established rule is that an automatic stay of judicial proceedings against one defendant does not apply to proceedings against co-defendants. See, e.g., Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir.1983). Thus MSB's appeal as it relates to The Andreola Companies as well and The Andreola Companies' cross-appeal against MSB are both unaffected by Daniel Andreola's bankruptcy petition
 A less settled question is whether the automatic stay provision contained in 11 U.S.C. Sec. 362 applies to appeals from trial court decisions in proceedings originally initiated against the debtor. MSB's appeal appears to be clearly a proceeding against the debtor, Daniel Andreola, which is stayed by 11 U.S.C. Sec. 362. Moreover, based on the persuasive holdings and reasoning contained in Cathey v. Johns-Manville Sales Corp., 711 F.2d 60 (6th Cir.1983), and Association of St. Croix Condominium Owners v. St. Croix Hotel, 682 F.2d 446 (3d Cir.1982), we conclude that Daniel Andreola's cross-appeal against MSB, although initiated by the debtor, is also stayed by 11 U.S.C. Sec. 362. Nevertheless, given the identity of positions taken by Daniel Andreola and The Andreola Companies, the issues presented in the instant appeal are unaffected by Daniel Andreola's bankruptcy petition.
 
 
 [5]
 In Leyden, the basis of the trial court's damage award was unclear. The Massachusetts Supreme Court first concluded that the amount awarded could be supported as an approximation of the plaintiff's lost profits. In the alternative, the supreme court held that the award could be upheld as a rough approximation of defendant's profits. It is far from clear whether Leyden involved a situation like that presented here where the defendant's profits exceeded the plaintiff's loss, or whether Leyden was simply a case where the plaintiff's loss could not be accurately determined thereby requiring the court to look to defendant's profits. The supreme court noted, however, that its conclusion was based in part on "need" given the difficulty of determining the plaintiff's loss. In the instant case, in contrast, the jury was able to directly determine the plaintiff's loss. Thus, we need not determine whether Texas courts would permit recovery based on defendant's profits where plaintiff's loss could not be directly determined
 
 
 [6]
 Several courts have used similar reasoning to limit a plaintiff's recovery for tortious interference to what the plaintiff's recovery would have been for breach of contract. In American Air Filter Co., Inc. v. McNichol, 527 F.2d 1297 (3d Cir.1975), for example, the court expressly refused to permit recovery of defendant's profits in a tortious interference with contract action. The court held that "the measure of damages for interference with contractual relations will be identical to that for breach of contract." Id. at 1300. The court observed that "[t]he defendant's profit margin may be higher than plaintiff's for any number of reasons--e.g., product more efficiently made or distributed. To compel defendant to disgorge these profits could give plaintiff a windfall and penalize the defendant, neither of which serves the purpose of contract damages." Id. Similarly, in Western Oil & Fuel Co. v. Kemp, 245 F.2d 633 (8th Cir.1957), the court limited the tortfeasor's liability to the liquidated damages provided in the contract. In doing so, the court alluded to the principle that "[a] party recovering damages for breach of contract should not be better off because of the breach than he would have been had there been no breach." Id. at 644
 
 
 [7]
 MSB contends that Andreola's conduct was unrelated to the initial breach--Jefferson's failure to pay a commission on the aborted Pacific transaction. However, there was evidence to support a conclusion that Andreola was involved in that breach. See Record Vol. VIII at 191-99; Record Vol. VII at 54, 93. Thus, even if each breach constituted a separate injury, the district court could have found Andreola jointly and severally liable for each injury
 
 
 [8]
 Article 2226, which was still in effect at the time of the district court's judgment, provided in pertinent part that:
 Any person, ... having a valid claim against a person or corporation for ... suits founded upon a sworn account or accounts, or suits founded on oral or written contracts ... may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees.
 Article 2226 has now been codified at Sec. 38.001 of the Texas Civil Practice & Remedies Code. Section 38.001 provides that:
 A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract.
 
 
 [9]
 However, in several other Texas cases decided since 1977, courts have also stated that a final judgment is required to recover attorney's fees on a claim under article 2226. See, e.g., Siegler v. Williams, 658 S.W.2d 236, 240 (Tex.App.--Houston [14th Dist.] 1983, no writ); Corpus Christi Development Corp. v. Carlton, 644 S.W.2d 521, 523 (Tex.App.--Corpus Christi 1982, no writ). In Corpus Christi Development, the court observed:
 We note that the requirement that the plaintiff 'should finally obtain judgment' was deleted from the statute in 1979 (eff. June 6, 1979). Even without this provision, in the context of a suit that goes to trial, a judgment is a condition precedent to recovery of attorney's fees because a 'valid claim' is not established until the plaintiff gets a judgment that is supported by the pleadings and the proof.
 
 
 [644]
 S.W.2d at 523. In the context of a case that does not go to trial, Texas courts apparently recognize an exception to the final judgment condition where the plaintiff recovers on its claim without the need for a judgment. In Buckner Glass & Mirror v. T.A. Pritchard Co., 697 S.W.2d 712 (Tex.App.--Corpus Christi 1985, no writ), the defendant paid the full amount of actual damages sought by plaintiff prior to trial. The court concluded that in those circumstances an award of attorney's fees under article 2226 was appropriate, even in the absence of a final judgment. Unlike the instant case, however, the plaintiff in Buckner Glass successfully recovered on its article 2226 claim, even though no trial and judgment were required in order to do so
 
 
 [10]
 In Allright v. Guy, 696 S.W.2d 603, 605 (Tex.App.--Houston [14th Dist.] 1985, no writ), cited by MSB, the court emphasized that the plaintiff had recovered a favorable judgment on its article 2226 claim
 
 
 [11]
 We note that article 2226 is intended to discourage unnecessary litigation on contract claims. Given the size of MSB's potential tort recovery as well as the requirement that MSB elect recovery on either its tort or contract claim but not both, it is unclear that the potential availability of attorney's fees on the contract claim would have tended to avert this litigation
 We also note that Texas courts have concluded under what has been described as the "strikingly similar" attorney's fee provision of the Texas Deceptive Trade Practices Act, see Widmer v. Stamps, 663 S.W.2d 875, 882-83 (Tex.App.--Houston [14th Dist.] 1983, no writ), that in the absence of actual recovery, a prevailing party is not entitled to an award of attorney's fees. See Nabours v. Longview Sav. & Loan Ass'n, 700 S.W.2d 901, 905 (Tex.1985).
 
 
 [12]
 Neither of the two additional cases relied upon by Andreola require or even suggest a different conclusion. In Garza v. Mitchell, 607 S.W.2d 593 (Tex.Civ.App.--Tyler 1980, no writ), the prior contract allegedly interfered with had been adjudicated invalid. Thus the subsequently granted contractual right was not in derogation of any preexisting contractual rights. In American Petrofina, Inc. v. PPG Industries, Inc., 679 S.W.2d 740 (Tex.App.--Fort Worth 1984, writ ref'd n.r.e.), the two contracts involved were executed at approximately the same time, in the course of the same transaction, and were designed to compliment one another. Without discussing whether a subsequent contract could afford legal justification, the court concluded that "there [was] no evidence that Fina acted under anything other than a good faith belief" and that "such complete innocence and perfect good faith might very well be the basis of the justification which constitutes a defense to a claim for tortious interference with contract." Id. at 758-59
 
 
 [13]
 Andreola represented Commercial Savings as broker during the course of negotiations regarding the proposed Jefferson/Commercial Savings transaction
 
 
 [14]
 Virtually all of this evidence was contested at trial. However, credibility determinations are for the jury, not for this Court sitting on appeal. Under the Boeing standard, this Court is required to consider the evidence in the light and with all reasonable inferences most favorable to the verdict
 
 
 [15]
 Andreola's two remaining contentions raised on appeal require little discussion. Andreola argues that its brokerage contract with Jefferson entitled it to indemnification from Jefferson for all liability arising out of the instant action. However, for the same reasons that the Andreola/Jefferson agreement did not "justify" Andreola's tortious conduct, it did not entitle Andreola to indemnification
 Andreola also contends that the district court erred by permitting expert testimony that the custom and practice in the brokerage industry required Andreola to evenly split its commission with MSB. Even if the district court erred in allowing this testimony, the error was harmless. The jury clearly rejected the expert testimony by only awarding MSB 10% of Andreola's commission on MSB's breach of contract claim. Moreover, the testimony was directed toward MSB's contract theory of recovery. MSB has elected, however, to pursue its tort rather than contract remedy. MSB's tort recovery (which was half of Andreola's commission) appears to have been based on the fact that MSB's commission rate was half that of Andreola.