**Robert J. CRAMER, Appellant,**

v.

**Rick WADE, individually and d/b/a R & R Diving, Appellee.**

No. S–8140.

Supreme Court of Alaska.

Aug. 13, 1999.

Jeffrey P. Stark, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellant.

John C. Wendlandt, Walker Walker Wendlandt & Osowski, LLC, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, FABE, and BRYNER, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

Alaska resident Rick Wade loaned money to TSO and Kokua, Inc., two companies embarking on a business venture in California. He acted in part based on information that he had received from Kokua president Robert J. Cramer, a California resident. In return for Wade's loan, Cramer signed a note on behalf of Kokua promising repayment within ninety days. But when the note went unpaid, Wade filed suit in Alaska against Cramer, Kokua, TSO, and others and obtained a default judgment. The superior

court denied Cramer's motion to set the judgment aside for lack of personal jurisdiction. We affirm, concluding that Cramer's contacts with Alaska satisfy minimum due process requirements, that his status as Kokua's president affords him no shelter from personal jurisdiction, and that he has failed to prove any other substantial injustice.

## II. *FACTS AND PROCEEDINGS*

Kokua, Inc., is a Nevada corporation. Robert Cramer, its president, and Frank Watkins, its secretary, are Kokua's sole shareholders. At all times relevant to this case, Cramer and Watkins were residents of California. Neither has ever been to Alaska. In early 1992, Kokua's only substantial asset was a contract to purchase a certain mining interest near Susanville, California; Kokua was attempting to close on its contract.

At about the same time, an unrelated California business venture named TSO was attempting to develop a truck stop near Tracy, California. TSO needed about $135,000 in short-term financing to launch the project. Vince Estelle, a TSO partner, mentioned the project to Cramer, a business acquaintance, offering him an equity interest in the truck stop in return for help in financing. Estelle also heard from an associate that Rick Wade—a resident of Valdez, Alaska—might be interested in investing. He contacted Wade to discuss the project. In late February 1992, Estelle spoke again with Cramer, saying that he had arranged a $135,000 loan from Wade but needed someone to guarantee payment of the note. Estelle offered Cramer an equity interest in the truck stop in return for the guarantee.

Cramer later spoke with Watkins about the truck stop project and about Estelle's proposition. Cramer and Watkins were interested in the project, and both thought that Estelle's proposition was attractive. But neither wanted to risk personal exposure for such a large amount of money, so they decided to have Kokua act as the guarantor.

On February 28, 1992, Cramer, Watkins, and Estelle met at Watkins's office in Campbell, California, and telephoned Wade in Alaska to discuss the financing behind the truck stop project. Though Cramer and Wade dispute the details of the conversation, it is undisputed that the purpose of the call was to encourage Wade to make the loan, that Cramer spoke with Wade, and that they discussed the financial soundness of the truck stop project.

That same day Cramer also had Estelle fax various documents to Wade regarding Kokua that tended to show that the company was on firm financial ground. After speaking with Cramer, Wade decided to go through with the loan. On March 3, 1992, Wade received a faxed copy of a promissory note signed by TSO partners Estelle and Rick Peters, as well as by Cramer and Watkins, on behalf of Kokua. The note named TSO and Kokua as payees and promised to pay Wade $135,000, plus monthly interest of three percent, by June 3, 1992. Wade also received a fax from Cramer indicating:

> I am instructing our escrow officer to retire our note to you dated Mar. 3, 1992, at the close of the Escrow. You will be [paid] $135,000.00 princip[al] plus $12,150.00 in interest for a total of $147,150.00 directly from Cal–Seria [sic] Title Co.

By telephone from Valdez, Wade then directed a wire transfer of the loan funds to TSO's bank account in California.

TSO subsequently lost its financing for the truck stop, and Kokua also lost its contract to purchase mining rights. Neither repaid the promissory note to Wade.

In November 1993 Wade filed an action in Valdez to collect on the note. He named as defendants Kokua, TSO, Cramer, Watkins, Estelle, and Peters. The complaint stated claims for debt, breach of contract, and fraud and misrepresentation; it sought both compensatory and punitive damages. The superior court entered a default judgment against all defendants on May 8, 1995. Shortly after Wade attempted to collect on the note in California, Cramer, Watkins, and Kokua moved under Alaska Civil Rule 60(b)(4) to set aside the default judgment as void for lack of personal jurisdiction. After considering affidavits filed by the parties, the court declined to set the judgment aside,

finding adequate grounds for personal jurisdiction. Cramer appeals this judgment.[1]

## III. DISCUSSION

### A. Cramer Established Minimum Contacts with Alaska to Satisfy Due Process Requirements for Personal Jurisdiction.

Civil Rule 60(b)(4) allows courts to grant relief from any judgment that is void. A judgment is void if the court that rendered it lacked personal jurisdiction over the defendant.[2] Cramer contends that Alaska lacked personal jurisdiction over him because Wade's claim falls outside the scope of AS 09.05.015, Alaska's long-arm statute. Wade responds that the court had personal jurisdiction under subsections (a)(3), (a)(4)(A), and (a)(5)(D) of the long-arm statute.

Alaska Statute 09.05.015(a)(3) gives Alaska courts personal jurisdiction "in an action claiming injury to person or property in or out of this state arising out of an act or omission in this state by the defendant." Construing this provision in *Kennecorp*

*Mortgage & Equities, Inc. v. First National Bank of Fairbanks*,[3] we recognized that failing to pay monetary obligations owed to an Alaska creditor is an "omission in this state" causing "injury to property."[4] Moreover, AS 09.05.015(a)(4)(A) "applies in an action claiming injury to person or property in this state arising out of an act or omission out of this state when the defendant carried on solicitation or service activities" in this state. Here, Cramer's active solicitation of a loan from Wade by calling him in Valdez and his alleged acts of misrepresentation during the course of their interactions arguably would place Wade's claim within subsection (a)(4)(A) even if the injury to Wade were viewed as resulting from Cramer's acts or omissions outside Alaska.[5] Finally, subparagraph (a)(5)(D) of the long-arm statute confers personal jurisdiction in an action that "relates to goods ... or other things of value shipped from this state ... on the order or direction of the defendant." In *Kennecorp Mortgage* we indicated that this provision would allow jurisdiction over an out-of-state party receiving funds from an Alaska resident.[6]

1. Kokua did not appeal. Watkins did appeal, but subsequently notified this court that he had filed for bankruptcy in California. Although federal courts conflict on the issue, the majority rule appears to be that in a proceeding originally filed against the debtor, any pending appeal, whether by the plaintiff or debtor/defendant, is automatically stayed by virtue of 11 U.S.C. § 362(a)(1). *See, e.g., Farley v. Henson*, 2 F.3d 273, 275 (8th Cir.1993) (section 362 applicable to appeal by defendant/debtor); *Ingersoll–Rand Fin. Corp. v. Miller Mining Co.*, 817 F.2d 1424, 1426 (9th Cir.1987) (same); *Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207 (2d Cir.1986) (same); *Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 230 n. 4 (5th Cir.1986) (same); *Cathey v. Johns–Manville Sales Corp.*, 711 F.2d 60, 61–63 (6th Cir.1983) (same); *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 447–49 (3d Cir.1982) (same). *But see In re Lyngholm*, 24 F.3d 89, 91–92 (10th Cir.1994); *see also Southern Bank & Trust Co. v. Harley*, 295 S.C. 423, 368 S.E.2d 908, 909 (1988) (stay does not prevent debtor from petitioning for appellate review); *Greenspoint Palms Ltd. v. Greenspoint Co.*, 795 S.W.2d 219, 220 (Tex.App.1990) (same). For the reasons stated by the Ninth Circuit in *Ingersoll–Rand*, 817 F.2d at 1426, we find the majority rule preferable; we therefore deem Watkins's appeal stayed and decline to consider it. Because neither party has addressed the conflicting case law, however, we limit our ruling to the present case.

2. *See Kennecorp Mortgage & Equities, Inc. v. First Nat'l Bank of Fairbanks*, 685 P.2d 1232, 1236–37 (Alaska 1984) (quoting *Holt v. Powell*, 420 P.2d 468, 471 (Alaska 1966)); *Aguchak v. Montgomery Ward Co., Inc.*, 520 P.2d 1352, 1354 (Alaska 1974). Whether a judgment is void is a question of law that we review de novo. *See Kennecorp*, 685 P.2d at 1236. The "burden of demonstrating want of jurisdiction or a denial of due process" falls on the moving party. *See Aguchak*, 520 P.2d at 1354; *see also Kennecorp*, 685 P.2d at 1237 ("Unless appellants can show that this case satisfies one or more of those conditions [for a void judgment], they cannot prevail on their Rule 60(b)(4) attack.").

3. 685 P.2d 1232 (Alaska 1984).

4. *Id.* at 1238; *accord Fairbanks Air Serv., Inc. v. Air Operations Int'l Corp.*, 378 F.Supp. 1405, 1406 (D.Alaska 1974).

5. *See Jonz v. Garrett/Airesearch Corp.*, 490 P.2d 1197, 1199 (Alaska 1971) ("The occurrence of an injury in Alaska allegedly caused by an act or omission by a defendant outside of Alaska is itself a contact with Alaska.").

6. *See Kennecorp*, 685 P.2d at 1238.

Cramer nevertheless raises specific challenges to each of Wade's long-arm theories, insisting that subsections (a)(3), (a)(4)(A), and (a)(5)(D) are inapplicable. But even if they had merit, Cramer's specific long-arm challenges would not be determinative. In *Glover v. Western Air Lines, Inc.,*[7] we expressly construed Alaska's long-arm statute to confer jurisdiction "to the maximum extent permitted by due process under the federal constitution."[8] And more recently, in *Alaska Telecom, Inc. v. Schafer,*[9] we reinforced *Glover* by recognizing that in allowing personal jurisdiction on "any other grounds provided by common law," our long-arm statute's catch-all subsection (c) extends to any case falling outside the statute's other subsections "in which the exercise of jurisdiction is permissible under the Fourteenth Amendment."[10]

Thus, reduced to its essence, Cramer's argument requires us to decide whether the Due Process Clause of the Fourteenth Amendment forbids an Alaska court to maintain personal jurisdiction over him. To answer this question we must consider the extent of Cramer's contacts with Alaska and the basic fairness of requiring him to appear in its courts: "[D]ue process analysis asks two questions: first, whether minimum contacts exist; second, whether maintenance of the suit is consistent with traditional notions of fair play and substantial justice."[11]

■ Here, Cramer had no ongoing ties to Alaska. But his limited contacts with Wade will nonetheless satisfy due process requirements if "they are substantial enough that [he] could reasonably anticipate being haled into court in [Alaska]."[12] Under the test established by the United States Supreme Court in *Burger King Corp. v. Rudzewicz,*[13] Cramer could reasonably anticipate being sued in Alaska if he " 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries 'that arise out of or relate to' those activities."[14]

Cramer's contacts are sufficient for personal jurisdiction under this test. Cramer's argument that his telephone calls alone could not establish personal jurisdiction is unpersuasive, for it overlooks the totality of the conduct that Cramer engaged in.[15] Cramer purposefully directed his activities at a resident of Alaska by telephoning and transmitting documents to Wade in Valdez, actively encouraging Wade's participation in the truck stop loan, pledging Kokua's assets to guarantee the loan's repayment, signing the promissory note of March 3, 1992, and sending Wade written confirmation that he had arranged direct repayment to Wade by Kokua's escrow officer. And Wade's suit against Cramer relates to and arises directly out of these contacts.

Under analogous circumstances, we commented in *American National Bank v. International Seafoods:*

This is not a case of [a nonresident defendant] passively standing by.... Rather, this is a case where the [defendant], knowing that its direct assurance to an Alaskan [resident] would be necessary in order to effectuate a commercial inter-state transaction, directly contacted the Alaskan [res-

7. 745 P.2d 1365 (Alaska 1987).

8. *Id.* at 1367.

9. 888 P.2d 1296 (Alaska 1995).

10. *Id.* at 1299 (quoting AS 09.05.015(c)).

11. *Alaska Telecom,* 888 P.2d at 1300; *see also Glover,* 745 P.2d at 1367.

12. *Glover,* 745 P.2d at 1367, *quoted in Alaska Telecom,* 888 P.2d at 1300.

13. 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

14. *Id.* at 472, 105 S.Ct. 2174 (citations omitted), *quoted in Alaska Telecom,* 888 P.2d at 1300.

15. In support of this argument, Cramer cites *Wessels, Arnold & Henderson v. National Medical Waste, Inc.,* 65 F.3d 1427, 1433 (8th Cir.1995) and *Piper v. Kassel,* 817 F.Supp. 802, 805 (E.D.Mo.1993). We need not decide whether these cases support Cramer's argument. To the extent that they suggest that jurisdiction cannot be founded on telephone calls alone, they are readily distinguishable from the present case, since, as our discussion in the text makes clear, Cramer's contacts went far beyond his telephone call to Wade.

ident]; ... and [made assurances of payment].[16]

Our comment in *American National* applies here.

### B. The "Corporate Shield" Doctrine Does Not Preclude Finding Personal Jurisdiction over Cramer.

■ Cramer nevertheless contends that he could not reasonably expect to be personally sued in Alaska because, throughout the transaction, he acted solely in his corporate capacity as Kokua's president. In so contending, Cramer asserts the "corporate shield" doctrine, which establishes "that a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity." [17]

But Cramer's own pleadings belie his assertion that he dealt with Wade exclusively as Kokua's corporate agent. The affidavits and documentary evidence that Cramer submitted establish that he and Watkins were Kokua's only shareholders and its principal officers. Before this transaction, the company did not actively do business guaranteeing loans; its sole significant asset was a contract to buy mining interests. According to Cramer himself, his involvement in the loan transaction grew out of his connection with Estelle. Nothing in Cramer's affidavit suggests that Estelle contacted Cramer in his corporate capacity. To the contrary, Cramer's and Watkins's affidavits suggest that Estelle first communicated TSO's proposal to Cramer personally; Cramer then passed the information on to Watkins; both men viewed the offer as "interesting" and "attractive" but were reluctant to risk personal exposure to a $135,000 loss; accordingly, they decided to handle the guarantee through Kokua.

In our view, this series of circumstances gives rise to a reasonable inference that in deciding to participate in Estelle's venture, in channeling the transaction through Kokua, and in subsequently encouraging Wade to go through with the loan, both Cramer and Watkins acted primarily, if not exclusively, to further their own interests, not those of Kokua.

In any event, under a proper due process analysis it is entirely beside the point whether Cramer acted for himself or solely in his corporate capacity as Kokua's president. The only relevant point is that Cramer himself—in whatever capacity he acted—engaged in significant contacts with Alaska. In *Calder v. Jones*,[18] the United States Supreme Court held, in determining whether a state offended due process by asserting personal jurisdiction over individuals who had acted in a corporate setting, that "[e]ach defendant's contacts with the forum State must be assessed individually." [19] And in *Calder's* companion case, *Keeton v. Hustler Magazine, Inc.*,[20] the Supreme Court explained that *Calder*, by so holding, rejected "the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." [21]

Regardless of whether he purported to act individually or in his corporate capacity, Cramer personally engaged in almost all of the significant contacts that could justify personal jurisdiction over either Kokua as a corporate entity or over Cramer as an individual. Considering Cramer's individual contacts with Alaska, we conclude, in light of these circumstances, that even if he could be deemed to have acted exclusively in his corporate capacity, due process would not shield him from suit in his individual capacity.

### C. Cramer's Potential Merit Defenses Do Not Preclude Personal Jurisdiction.

Cramer further argues that there can be no basis for asserting personal jurisdiction here because his affidavits conclusively negate the claims of fraudulent misrepresenta-

---

16. *American Nat'l Bank v. International Seafoods,* 735 P.2d 747, 752–53 n. 10 (Alaska 1987).

17. *Arkansas Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.,* 797 F.2d 565, 574 (8th Cir.1986).

18. 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

19. *Id.* at 790, 104 S.Ct. 1482.

20. 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

21. *Id.* at 781 n. 13, 104 S.Ct. 1473.

tion that Wade levels against him personally, and unequivocally establish that he never personally promised to repay the loan—that only Kokua guaranteed repayment. Cramer insists that, at most, Wade's affidavits conflict with his own, raising genuine factual issues concerning the existence of jurisdiction that the superior court should not have resolved without first holding a hearing.[22]

But while these arguments raise potential defenses, they have no bearing on our jurisdictional ruling. As should be clear from our discussion above, our conclusion that Cramer's contacts suffice to establish personal jurisdiction does not assume the truth of Wade's assertions. Instead, we have predicated our jurisdictional ruling on facts that are undisputed. To the extent that Cramer's evidence casts doubt on the underlying merits of Wade's claims, it is foreclosed by the default judgment.

D. *Personal Jurisdiction over Cramer Comports with Fair Play and Substantial Justice.*

■ Having concluded that Cramer's contacts with Alaska satisfy the minimum contacts requirement of due process, we turn to the second part of the due process analysis, which entails a broader inquiry into fairness:

> After it has been determined that a defendant purposefully established minimum contacts within the forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.[23]

Cramer bears the heavy burden of establishing basic unfairness:

> [W]here a defendant who has purposefully directed his activities at forum residents seeks to defeat jurisdiction, the defendant must present a compelling case that certain considerations render jurisdiction unreasonable.[24]

Cramer asserts that his lack of ties to Alaska would render a defense in this state "obviously inconvenient and unreasonable." But conclusory assertions of this kind do not amount to a compelling showing:

> [B]ecause "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.[25]

We have already expressly rejected Cramer's claim of insubstantial contacts with Alaska and have held that he should reasonably have anticipated being haled into an Alaska court. Moreover, Cramer is now a Utah resident; Kokua is a Nevada corporation; and TSO and other defendants are located in California. Given these circumstances, no other forum presents obvious advantages. Because we see no compelling reason why jurisdiction would not comport with fair play and substantial justice, we hold that Cramer has failed to carry his burden.

## IV. CONCLUSION

Because we conclude that Cramer has established minimum contacts with Alaska and has failed to prove that jurisdiction in this state would violate fair play and substantial justice, we AFFIRM the superior court's order denying Cramer's motion to set aside the judgment as void for lack of personal jurisdiction.

EASTAUGH and CARPENETI, Justices, not participating.

---

**22.** Cramer cites *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280 (9th Cir. 1977), for the proposition that when the issue of personal jurisdiction hinges on factual issues that are genuinely disputed, the court must hear and resolve these factual disputes before ultimately determining jurisdiction.

**23.** *Alaska Telecom, Inc. v. Schafer*, 888 P.2d 1296, 1301 (Alaska 1995) (citing *Burger King*

*Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

**24.** *Id.* (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174).

**25.** *Id.* (citing *Burger King*, 471 U.S. at 474, 105 S.Ct. 2174).