MOBIL CHEMICAL COMPANY, Plaintiff-Appellee Cross-Appellant,

v.

BLOUNT BROTHERS CORPORATION, Defendant-Appellant Cross-Appellee,

v.

SAUER INDUSTRIAL CONTRACTING, INC., et al., Defendants-Appellees;

Newtron, Inc., Defendant-Appellee Cross-Appellant.

No. 86–2008.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 1987.

Anthony G. Brocato, Crutchfield, DeCordova & Brocato, Beaumont, Tex., T. John Ward, Longview, Tex., Andrew J. Noble, III, Birmingham, Ala., for Blount Bros. Corp.

James L. Weber, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., David A. Borkovic, Joseph A. Katarincic, Kirkpatrick & Lockhart, Pittsburgh, Pa., for Sauer Indus. Contracting, Inc.

Frederick R. Tulley, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Newtron, Inc.

Douglas S. Johnston, Elaine L. Larson, Crady & Peden, Houston, Tex., for B & B Insulation, Inc.

Brack Jones, Jr., Moore, Landrey, Garth & Jones, Beaumont, Tex., Judah Lifschitz, Lisa B. Horowitz, Finley, Jumble, Wagner, Heine, Underberg, Manley & Casey, for Andreco Refractory Services, Inc.

W.H. Jordan, Jr., Houston, Tex., for Riggers & Constructors, Inc.

Michael C. Russ, Michael Eric Ross, King & Spalding, Atlanta, Ga., James H. Chestnutt, II, Orgain, Bell & Tucker, Beaumont, Tex., for Mobil Chemical Co.

Before GEE, POLITZ, and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

The parties to this action somehow built a chemical plant. They have been trying to figure out who should pay for it ever since. Both the owner and the general contractor have tried to escape all liability, although neither disputes that the subcontractors ended up about $4 million underpaid. We agree with the district court that both are liable. On this and other issues too numerous to summarize here, we affirm in large part, reverse in part, and remand for further proceedings.

*A. Facts and Prior Proceedings*

This case arises out of a $37 million contract for the construction of a chemical plant. Mobil Chemical is the owner, Blount Brothers the general contractor, and the other parties are subcontractors. Blount Brothers acted as construction manager; it did none of the actual construction. The general contract was for a fixed-price and called for "best efforts" to complete the project by January 1983.

Work began in the fall of 1981. The early phases of the project were significantly delayed by Mobil's failure to provide foundations and to have various components in place at times specified by the contract. Construction fell behind schedule. Blount's planning and scheduling tasks grew more complicated when Mobil failed to meet deadlines for delivery of components. Moreover, Blount's first project manager was not capable of managing such a large and complex construction job. Also, Blount's first construction schedule was prepared by an employee innocent of the ability to prepare such a schedule for a complex project, and Blount did not assign a competent full-time scheduler to the project site until December 1981. The work of the different crafts went uncoordinated, and construction proceeded chaotically and behind schedule.

In the fall of 1982, Mobil and Blount made a joint decision to push the subcontractors to meet the January 1983 completion date by overmanning and acceleration. Mobil knew that the project would not be finished until some months later and told Blount that a later completion would be acceptable. Both Blount and Mobil, however, maintained a united position toward the subcontractors that completion by January was crucial. Mobil threatened to black-ball several subcontractors if they did not add workers and make up time. Mobil's motive for rushing the project is obvious: it wanted a producing plant as soon as possible. Blount's motive is less clear, but apparently its costs as project manager were increased little by acceleration. Indeed, an early completion date would reduce its total overhead costs for managing the project, thereby increasing its profit on the fixed-price contract.

The project was completed in April 1983. Blount submitted claims to Mobil for additional compensation for itself and on behalf of its subcontractors Sauer Industrial Contracting, Inc.; Newtron, Inc.; Andreco Re-

fractory Services, Inc.; B & B Insulation, Inc.; and Riggers and Constructors, Inc. In response, Mobil launched a preemptive strike: it sued Blount and the subcontractors in the Eastern District of Texas for a declaratory judgment that it owed nothing to any of them, and, in the alternative, that it was contractually indemnified by Blount for any amounts it owed Blount and the subcontractors. Blount and the subcontractors filed counterclaims against Mobil and each other.

Shortly before trial, Mobil settled with Sauer, Newtron, B & B, and Riggers. These settlements took the form of "Mary Carter" agreements. The subcontractors accepted payments from Mobil, agreeing to pursue their claims against Blount and to pay Mobil any amount received from Blount up to the amount of Mobil's payment. Excess amounts were to be split fifty-fifty. Only Andreco did not settle with Mobil.

The case was tried to the bench. The district court concluded that the general contract was governed by New York law and that the subcontracts were governed by Texas law. Holding that contract breaches by Mobil and Blount and their negligent joint decision to accelerate were equal causes of the subcontractors' acceleration costs, the court ordered Mobil to release the final $2 million retainage to Blount, awarded the subcontractors virtually all of their claimed damages to be paid by Blount and Mobil in equal shares, and settled several other minor disputes. Both Blount and Mobil appeal.

### B. Divvying Up Liability Between Blount and Mobil

■ The district court found that the subcontractors' acceleration damages were due equally to negligence and contract breaches by Blount and Mobil. Because "the district court's account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse even

were we inclined to disagree. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). And, after reviewing the record, we are not even inclined to disagree.

This case is a paradigm of the inadequacy of legal rules and legal institutions for parsing the messy stuff of life into precise categories. Only God knows to what exact extent the various strategic choices and mistakes of all those concerned in this case eventually caused the damages at stake. And that is exactly why the "clearly erroneous" rule is an appropriate standard of review. It shifts educated guess-work and intuitive justice to the trial court, to the person who was immersed in and who looked most carefully at the mess, from the best vantage point.

No party directly challenges the findings of the district court. Instead, both Blount and Mobil seek to absolve themselves of liability in the face of the facts found by the district court. We take up their arguments in turn.

#### 1. Blount's Attempted Escapes

First, Blount cites lots of cases involving owner liability for acceleration damages. *See, e.g., Norair Engineering Corp. v. United States,* 666 F.2d 546, 229 Ct.Cl. 160 (1981) (hortatory comments can cause an acceleration; excusable delay should be excluded in assessment of whether an acceleration occurred). These decisions impose acceleration damages only on the owner; none takes up the question of the liability of general contractors for subcontractors' acceleration costs. Blount contends that the absence of decisions imposing acceleration damages on a general contractor means that only the owner can be liable for such damages.[1] From this, Blount argues that the district court's factual findings are not dispositive because they were made under an erroneous legal standard. *See Pullman-Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66

---

**1.** Blount has overlooked cases that involve a general contractor's liability for acceleration damages. *See, e.g., S. Leo Harmonay v. Binks Mfg. Co.,* 597 F.Supp. 1014 (S.D.N.Y.1984) (applying New York law; general contractor liable to subcontractor for acceleration damages), *aff'd mem.,* 762 F.2d 990 (2d Cir.1985).

(1982). Again, the "erroneous" legal standard seems to be the very idea that the general contractor could be liable for acceleration damages. Blount concludes: "The law simply will not support imposing half of the acceleration costs upon the general contractor because of what the district court terms a 'joint decision' to accelerate. The 'joint decision' was simply Blount's compliance with the owner's requirements." Appellant's brief at 25.

Putting aside the circular attempt to undermine the findings of the district court, this argument comes down to an assertion that Blount cannot be held liable for its participation in the acceleration because other reported decisions do not impose liability on the general contractor. But liability depends on facts, and the facts of this case are different from those in the cases on which Blount relies. The district court found that the subcontractors' losses were caused by Blount and Mobil. There is evidence that the early delays were caused both by Mobil's failures and Blount's poor management. Furthermore, there is evidence that Blount was just as interested in accelerating as Mobil. Unlike the typical general contractor, Blount undertook no actual construction. Under the fixed-price contract, it stood only to gain by rapid completion of the project. Blount's management costs were relatively constant during the acceleration, so an early completion was the most effective way to lower costs and increase profits. We find no error in the district court's finding that Blount was perpetrator and not victim of the acceleration.

Blount's second argument is that Newtron and Sauer did not establish a "legal basis" for the amount of their damages. This seems to be either an argument that there was insufficient evidence to support the district court's damage award, that the damages were too uncertain to be recoverable, or that the damages were not caused by Blount's negligence and breach. Once again, what starts out as a "legal" argument slides into an argument about the facts. The amount and causality of damages was not established with unshakable certainty, but that is not required. The fact-finder's task is more limited:

> Actual damages must be proven; they cannot be merely speculative or conjectural. While the breaching party should not escape liability because of the difficulty in finding a perfect measure of damages, the evidence must furnish data for a reasonably accurate estimate of the amount of damages. It must be reasonably evident that the amount allowed rests upon a certain basis.

> The amount and measure of damages must be determined in relation to the particular contract in issue and the circumstances surrounding its breach. The question of the certainty of proof of damages becomes a matter for decision in each individual case.

*Nat Harrison Associates v. Gulf States Utilities Co.,* 491 F.2d 578, 587 (5th Cir. 1974) (citations omitted). Because this individualized sifting of the evidence should not be repeated at a trial *de novo* in the Court of Appeals, *see Anderson v. City of Bessemer City,* 470 U.S. at 573, 105 S.Ct. at 1512, we have held that damage awards are findings of fact which we will reverse only upon clear error. *See NCH Corp. v. Broyles,* 749 F.2d 247, 254 (5th Cir.1985). There is plenty of disputed evidence in the record about the amount and causation of the subcontractors' damages. The district court's damage awards are plausible resolutions of these disputes and we affirm them.

■ Blount's third argument revolves around the Texas "one satisfaction" rule. Blount contends that the "one satisfaction" rule applies and that it is entitled to reduce its liability by the amount of Mobil's settlement payments; in other words, it asserts that it is liable to the subcontractors for only the difference, if any, between their settlement payments from Mobil and their total damages.

In *Bradshaw v. Baylor University,* 126 Tex. 99, 84 S.W.2d 703 (1935), the Texas Supreme Court held that a plaintiff who had settled with one tortfeasor could not

recover from a joint tortfeasor when the settlement fully compensated him for his injury. Bradshaw was injured in a collision between a bus owned by Baylor and train owned by a railroad company. Bradshaw had settled with the railroad and assigned to it his rights against Baylor except for the first $100 in damages received from Baylor, if any.[2] The court refused to look through the formal plaintiff Bradshaw to the railroad who was the real party in interest; it held that a claim by the railroad for contribution was not before it and that Bradshaw could not recover anything from Baylor because the settlement had covered all his damages proved at trial.

*Bradshaw* spawned a Texas doctrine of tort and contract that settlement payments by non-parties should be deducted from any additional recoveries so that the injured party received no more than "one satisfaction" of his claim. This doctrine was apparently overruled in *Cypress Creek v. Muller,* 640 S.W.2d 860 (Tex.1982), and *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984). In those cases, the Texas Supreme Court interpreted a partial comparative negligence statute and erected a comprehensive scheme of "comparative causation" in strict liability tort cases. The court decided that a settling tortfeasor's pro rata share based on fault or causation rather than the dollar amount of the settlement should be deducted from the injured party's recovery. The court recognized that the injured party might recover more or less than his injury under this scheme (thus more or less than "one satisfaction") but decided that post hoc judicial interference in the settlement bargaining process was unnecessary because everyone got what they bargained for and no one was harmed. Blount argues that the "one satisfaction" rule somehow has survived *Duncan* in Texas contract law. It cites for that proposition *Marcus, Stowell & Beye v. Jefferson Inv. Corp.,* 797 F.2d 227 (5th Cir. 1986), and *Bradford Trust Co. v. Texas American Bank—Houston,* 790 F.2d 407 (5th Cir.1986).[3]

We doubt that the "one satisfaction" rule can withstand the rule of *Duncan* in any context, tort or contract,[4] but we need not decide this question of Texas law. The rationale of the "one satisfaction" rule is that double recoveries are against public policy. *Marcus, Stowell,* 797 F.2d at 233. In this case, however, Mobil's "settlements" with the subcontractors are "Mary Carter" agreements.[5] The damages these subcontractors recover from Blount will be

---

2. This is an early example of a "Mary Carter" agreement; these agreements occupy us briefly below.

3. In *Marcus, Stowell* the plaintiff broker sued an investment company for breach of contract and another broker for tortious interference with contract on the theory that the defendant investment company had used the defendant broker in violation of an exclusive brokerage agreement. The plaintiff settled with the investment company. Under the rubric of the Texas "one satisfaction" rule, our court affirmed the district court's reduction of damages payable by the non-settling broker by the dollar amount of the plaintiff's settlement with the investment company. 797 F.2d at 233. In *Bradford Trust,* our court declined to apply Texas comparative negligence principles in a case between two negligent banks involving a wire transfer fraudulently induced by a third party.

4. The "one satisfaction" issue will seldom arise in a contract case because the injured party's damages are usually payable only by the person with whom it has a contract. In hybrid cases of contract and tort, such as this one, Texas courts would probably extend their comprehensive comparative causality scheme to apportion damages and to leave any settlements standing. *Marcus* and *Bradford* are not to the contrary. In *Bradford* the question was whether comparative negligence should apply at all to commercial wire transfers; the opinion invoked special considerations of commercial banking. *Marcus* used "one satisfaction" language, but did not rule on the key question of the interaction of settlements with comparative causality. The point of *Marcus* was that the plaintiff could not keep its settlement from one party *plus* a judgment from the other for 100 percent of its actual damages! That is clearly impermissible in tort or contract under *Duncan* or any other rational scheme.

5. Blount does not dispute the propriety of these agreements under Texas law. *See, e.g., General Motors Corp. v. Simmons,* 558 S.W.2d 855, 856–59 (Tex.1977) (error to exclude evidence of "Mary Carter" agreements from jury; agreement assumed to be proper).

paid back to Mobil. None of the contractors will receive more than its settlement with Mobil. Therefore, the "one satisfaction" rule, if applicable at all, is satisfied.

*2. Mobil's Attempted Escape: The Indemnity Clause*

The contract between Mobil and Blount contains a section entitled "Article 12—Insurance." There are four paragraphs in Article 12. In paragraphs one and two, Mobil assumes the risk of all loss or damage to the plant, materials, and equipment, including those in transit to the construction site. In the third, Blount agrees to maintain insurance for workmen's compensation, comprehensive liability, and automobile liability. The fourth paragraph of Article 12 is an indemnity provision:

> 12.4 CONTRACTOR shall defend, indemnify and hold COMPANY, Mobil Oil Corporation and its subsidiaries and affiliates harmless from and against all losses, expenses, liens, claims, demands and cuases [sic] of action of every kind and character (including those of the parties, their agents and employees) for death, personal injury, property damage *or any other liability,* damages, fines or penalties (except where reimbursement of fines and penalties is prohibited by applicable laws) including costs, attorneys [sic] fees and settlements *arising out of or in any way connected with the WORK whether claimed by (a) CONTRACTOR,* its employees or agents or (b) *any of CONTRACTOR's subcontractors,* its employees or agents or (c) any other contractor, its employees or agents or (d) any third party *and whether resulting from or contributed to by (i) the negligence in any form except sole negligence* of COMPANY, Mobil Oil Corporation and its subsidiaries and affiliates and their agents, employees or independent third parties directly responsible to COMPANY or (ii) any defect in, or condition of the premises on which the WORK is to be performed or any equipment thereon or any materials furnished by COMPANY.

(Emphasis added.) Mobil argues that the "any other liability" indemnity provision covers any and all of its breaches of the contract. Mobil urges, in the alternative, that even if the clause does not cover contract breaches, it covers Mobil's negligent decision to accelerate because the acceleration was not the result of its "sole negligence."

The language of the provision is so broad that it might be read to indemnify Mobil against every liability related to the work except for "sole negligence." But New York law disapproves of indemnity provisions, so Mobil must make a powerful showing:

> Because it is unnatural that one would agree to indemnify another when otherwise under no such legal obligation, indemnity clauses are strictly construed. *Levine v. Shell Oil Co.,* 28 N.Y.2d 205, 212, 321 N.Y.S.2d 81, 85, 269 N.E.2d 799, 801 (1971). In construing such clauses, the court must determine whether "the intention to indemnify can be clearly implied from the language and purposes of the entire agreement, and the surrounding facts and circumstances." *Margolin v. New York Life Insurance Co.,* 32 N.Y.2d 149, 153, 344 N.Y.S.2d 336, 339, 297 N.E.2d 80, 82 (1973). Further, the court must consider whether the agreement reflects an unmistakable intent to indemnify. *Hogeland v. Sibley, Lindsay & Curr Co.,* 42 N.Y.2d 153, 159, 397 N.Y.S.2d 602, 606, 366 N.E.2d 263, 266 (1977).

*K/D Weatherbeaters, Inc. v. Gull Lake Industries,* 698 F.2d 954, 956 (8th Cir.1983) (applying New York law); *see also O'Brien v. Grumman Corp.,* 475 F.Supp. 284, 289 (S.D.N.Y.1979) (citing more cases to the same effect). We must decide if the indemnity clause relied on by Mobil "clearly implies" the intention to indemnify or shows an "unmistakable intent" to make Blount liable for all harms done by Mobil other than "sole negligence."

█ The district court held: "It is inconceivable that Blount would have agreed to indemnify Mobil for damages resulting

from its [Mobil's] own breaches of contract." We agree. Mobil's interpretation is completely artificial in the context of the entire contract. First, the location of the indemnity provision in "Article 12—Insurance" following provisions requiring Blount to maintain liability insurance shows that it was meant to apply to run-of-the-mill tort claims for injury, property damage, and death. It was not intended to alter fundamentally the meaning of the entire contract. Second, in "Article 25—Consequential Damages," the parties explicitly agree that neither should be liable to the other for any indirect or consequential damages. This Article is meaningless if Blount must indemnify Mobil for both direct and indirect damages to Blount itself and everyone else in the world. Finally, if the indemnity provision is given the meaning advanced by Mobil, no contract was formed at all. Under Mobil's reading, the contract would be void for lack of mutuality. Mobil would have no obligations under the contract; it could breach the contract in any way and to any extent and Blount would be liable to itself! This interpretation is ridiculous.

Mobil tries to rescue the argument from the lack of mutuality objection by urging that even if the indemnity provision does not cover its own breaches of contract, it does cover the joint *negligent* decision to accelerate. It is not clear to us why we should treat a negligent breach of contract differently from a deliberate one; but even if we were willing to grant that distinction, the argument will not fly. Either the indemnity clause covers both negligent and non-negligent breach of contract or neither. Negligent acceleration damages must be indemnified, if at all, under a literal reading of the same all-inclusive phrase ("any other liability") that would indemnify breach of contract claims as well. That phrase simply does not support the distinction that Mobil urges.[6]

Although we are lawyers, and although we spend too much of our professional lives listening to this sort of argument, we are nevertheless human beings of average intelligence and average common sense. It is inconceivable that a few words buried in the fourth section of the "Insurance" provisions of the general contract were intended to supersede the normal operation of tort and contract law for the entire agreement,

**6.** Mobil does not attempt to justify its interpretation by pointing to similar contractual language or similar facts in any New York cases. Instead, it cites two of our cases that apply *Texas* law: *Leonard v. Aluminum Co. of America,* 767 F.2d 134 (5th Cir.1985), and *Gulf Oil Corp. v. Burlington Northern Railroad,* 751 F.2d 746 (5th Cir.1985). These cases do not help Mobil's cause.

In *Leonard,* the plaintiff was injured by an exploding soft drink bottle cap. He sued ALCOA, the manufacturer of the capping machine. ALCOA sought indemnity from the bottling company that installed the cap. The district court held that under Texas law a blanket indemnity clause in the contract between the bottler and ALCOA was not to ALCOA's avail. ALCOA was found liable at trial for negligent failure to warn about the risks "that bottle caps might suddenly take flight." 767 F.2d at 136. Our court reversed. We held that ALCOA was not liable for negligent failure to warn under Texas law. Furthermore, we held that the clause required the bottler to pay ALCOA its costs and attorneys' fees in the suit; negligence was no longer an issue, so it was now immaterial that the indemnity clause did not meet the tough Texas standard for clauses indemnifying

one party for its own *negligent* acts. 767 F.2d at 137. The entire decision in *Leonard* has since been vacated and remanded. 800 F.2d 523 (5th Cir.1986). *Leonard* relied on *Alm v. Aluminum Co. of America,* 687 S.W.2d 374 (Tex.App.—Houston [14th Dist.] 1985), which was reversed by the Texas Supreme Court. 717 S.W.2d 588 (Tex.1986).

In *Gulf Oil,* our court enforced an indemnity provision in a lease of a railroad spur. Cars on the spur had rolled onto the main track and hit a train, damaging property of both the lessor and lessee. The lessor railroad's employees were found negligent in the way they had parked the lessee's cars. We held that a clause indemnifying the railroad for "loss or destruction of or damage to property whatsoever, in any manner caused by, resulting from or incident to storage of private cars on said track" satisfied the Texas requirement that the obligation be expressed in "clear and unequivocal" terms. We relied on a line of Texas cases holding that contracts making one party fully responsible for an "instrumentality, operation, or premises" satisfy the "clear and unequivocal" requirement. 751 F.2d at 748–49. Obviously, neither case helps Mobil meet its burden under New York law.

to shift all risks arising out of the contract to Blount, to alter essentially the relationship between the parties. We hold that Mobil is liable for the damages that it caused.

### C. A General Contractor's Mark-up on the Subcontractors' Acceleration Damages?

Under the general contract, Blount was entitled to a five percent mark-up on the cost of changes in the work. The district court held that this mark-up did not apply to the subcontractors' acceleration damages caused by Mobil.

> Except for [certain limited items] ..., all of the claims asserted by the subcontractors against Mobil are not for extra work within the meaning of the change-in-work provisions of the general contract. They are, rather, claims for payment for productivity losses that the subcontractors sustained in carrying out their base contract work.

> Blount is, therefore, not entitled to any mark-up from Mobil on any of the subcontractors' claims....

Findings of Fact and Conclusions of Law at 16.[7]

We are unable to agree with the district court's rationale. Productivity losses due to acceleration can fall within the change-in-work provision. Suppose that Blount's factual claims were true, and that the acceleration was therefore due entirely to Mobil. Work under materially changed conditions, such as an acceleration by the owner, is a change in work for which Mobil would have to compensate the subcontractors through Blount, regardless of whether Mobil agreed in writing to pay more, and regardless of the fact that the finished product was the same as that specified by the original contract. *See, e.g., S. Leo Harmonay v. Binks Mfg. Co.,* 597 F.Supp. 1014, 1026–28 (S.D.N.Y.1984) (applying New York law; requirement that work changes be in writing and absence of written changes does not preclude liability for acceleration damages), *aff'd mem.,* 762 F.2d 990 (2d Cir.1985); *cf. Savin Brothers, Inc. v. State of New York,* 62 A.D.2d 511, 516–17, 405 N.Y.S.2d 516, 520 (4th Dept. 1978) (interference and obstruction requiring extra work is a breach of contract by owner), *aff'd mem.,* 47 N.Y.2d 934, 419 N.Y.S.2d 969, 393 N.E.2d 1041 (1979); *Davis Accoustical Corp. v. National Surety Corp.,* 27 A.D.2d 624, 625, 275 N.Y.S.2d 925, 927 (3d Dept.1966) (owner requested work to be completed in an inefficient manner; held: "recovery [may] be had for extra work, orally directed, outside the scope of the contract, notwithstanding the provision that a claim for extra work must be supported by a written authorization."). Had Blount been without fault, Mobil would be liable to Blount for the five percent mark-up.

The real question is whether Blount's participation in the acceleration decision negates its right to recover a mark-up on Mobil's share of the resulting damages. For their own strategic reasons the parties have not addressed the question in this way, so they offer no relevant authority.[8] Our research has not uncovered any New York case that deals with this question.

Nevertheless, we do not hestitate to conclude that Blount should not receive a

---

**7.** The district court originally found that Andreco had $295,900.54 in extra work and acceleration costs, and divided this amount between Blount and Mobil. At the same time, the court allowed Blount a 25 percent mark-up on the $295,900.54. Apart from the question of where the 25 percent figure comes from, *see infra* note 11, this part of the decision seems inconsistent with the court's general conclusion that Blount could not recover a mark-up on acceleration damages. The district court amended its judgment as to Andreco but the amended judgment was equally inconsistent. *See infra* text accompanying note 9.

**8.** Blount, of course, never admits even for the sake of argument that it participated in the acceleration. Mobil refuses to acknowledge that the subcontractors work under materially adverse circumstances caused (in part) by Mobil is a change in work whether authorized in writing or not. Thus we have one more small failure of the adversary system, which relies so heavily on the parties to do the requisite research and analysis.

mark-up on damages owed to the subcontractors by Mobil. Had Blount only acquiesced in the acceleration, we think the courts of New York would not grant Blount its mark-up. The general contractor should be allowed a mark-up on subcontractors' acceleration damages only if it tries and fails to prevent the damages. Otherwise, it has a financial incentive to remain quiescent in the face of an owner acceleration. We think the opposite financial incentive is appropriate. A general contractor should stand with the subcontractors and request time extensions and extra payments in the face of acceleration pressures by the owner—in other words, it should demand an orderly and negotiated resolution of problems. In this case, of course, Blount went far beyond mere acquiescence in the acceleration. Therefore, the rule we have outlined applies *a fortiori* to deny Blount any mark-up.

### D. The Andreco Subcontract Modification

■ In its initial Findings of Fact and Conclusions of Law, the district court found that Andreco was scheduled to begin fireproofing in January 1982, but Blount's Project Manager determined that fireproofing would have to wait because the other crafts were in the way. When Andreco began, it was required to perform extra work and to work under "unanticipated and substantially adverse conditions." In November 1982, Blount orally modified Andreco's subcontract to include changed work and extra work on a cost-plus-not-to-exceed basis. The district court found that the changed conditions and extra work resulted from a combination of Mobil's breaches and negligence and Blount's breaches and negligence. The court initially ordered Mobil and Blount to split Andreco's damages for breach of the oral contract with Blount.

But in its Order Amending Judgment, the district court ordered Blount to pay all of Andreco's damages.

> Andreco's cause of action arises from Blount's breach of an oral modification of its subcontract with Andreco.... The total amount of damages owed to Andreco ... is recoverable only against Blount as the party committing the breach. Any contribution by Mobil to Blount's breach of Blount's agreement with Andreco has been addressed in the determination of damages owing between Mobil and Blount.

Order Amending Judgment at 3.

There are two problems with the final judgment as it relates to Andreco. First, Mobil's "contribution" to Andreco damages takes the form of a general contractor's mark-up of $73,975.14 on Andreco's claim. It was inconsistent for the district court to hold both that Blount alone is liable to Andreco for breach of contract and yet that Blount is entitled to its mark-up on the Andreco's damage claim.[9] Unfortunately, the district court did not separately identify the amount of Andreco's contract claim that was for "changes in the work" within the meaning of Article 8 of the general contract, the amount of the claim for extra work, and the amount for acceleration costs. Blount is entitled to full reimbursement from Mobil for Andreco's "changes in the work" claims under the general contract, if any, plus its five percent general contractor's mark-up.

Second, the acceleration damages aspect of Andreco's contract claim is no different in substance from those of all the other subcontractors. Yet, because Blount's manager agreed that Andreco should be paid more, Blount is now solely liable. There is no dispute that the adverse situation that gave rise to the oral modification was the result of both Mobil and Blount's breaches and negligence. There is also no dispute that Mobil received the benefit of Andreco's work under adverse circumstances. All the other subcontractors were threatened and coerced by Blount and Mobil into overmanning without any agreement for extra compensation. It would be anomalous to hold Blount solely liable to the one subcontractor that it treated fairly. The result reached by the district court

---

**9.** *See supra* note 7.

would give a general contractor the perverse incentive to threaten and stone-wall the subcontractors rather than renegotiate with them when a project is in disarray.[10]

Therefore, this aspect of the case is remanded for findings on the Blount's oral modification of the Andreco subcontract. The district court should affirm the judgment against Blount in favor of Andreco on the contract modification. Then, it should divide up Andreco's costs into three parts. First, it must determine the amount of charges under the modified contract, if any, for "changes in the work" within the meaning of the general contract. These claims must either be in writing and approved by Mobil, or they must come within some exception to this requirement under New York law. Mobil will be liable to Blount for the cost of this work plus a five percent mark-up to Blount. Second, the district court must determine what portion of the modification was for extra work under the general contract, if any, apart from extra work resulting from the acceleration. Blount is solely liable for this amount under the fixed-price general contract. Finally, the court must determine which charges resulted from the joint acceleration. In accordance with the treatment of the acceleration damages of the other subcontractors, Mobil must pay Blount half this amount.

### E. Who Pays for the "Steam Tracing Headers"?

The district court held that Sauer was not obligated to supply "steam tracing headers" under its subcontract. It apparently relied on paragraph six of the subcontract which states in part: "This Subcontractor [Sauer] shall furnish and install all steel piping from the steam supply headers to the distribution manifolds ..." The parties agree that "steam tracing headers" are described as "distribution manifolds" in the subcontract. The district court apparently

read the "from—to" language of the subcontract to *exclude* the distribution manifolds. It held that Blount was therefore liable for this item as general contractor because no Subcontractor was obligated to supply it.

"Distribution manifolds" are small in-line pipes to which the instrumentation for monitoring steam in the system is attached. Newtron is the instrumentation subcontractor. The negotiated rider to the pre-printed subcontract between Blount and Sauer contains the following provisions. Taken together, they show that the district court's interpretation of paragraph 6 was erroneous. The subcontract reads:

1. The following is a list of major items of work (labor and material) included in this Subcontract. This list is provided for clarification only, and does not relieve the Subcontractor from accomplishing all the piping, equipment erection and structural steel erection work (whether onsite or offsite) complete for the project, which is the intent of this Subcontract, unless specifically excluded in Paragraph 2 of this Rider.

a. All piping and appurtenances for the job complete

\* \* \* \* \* \*

2. The following is a list of items specifically excluded from this Subcontract:

\* \* \* \* \* \*

f. Instrumentation (Except installation of in-line devices)

\* \* \* \* \* \*

5. This Subcontractor shall furnish and install all steel piping from the steam supply headers to the distribution manifolds, including all steel tubing as shown on the drawings. The Instrumentation Subcontractor shall furnish and install all tubing for instrumenta-

---

**10.** The district court may have been uncomfortable with the idea of charging half Andreco's breach of contract damages to Mobil when they were not in privity of contract with each other. However, both Blount's mismanagement and Mobil's negligence and breach forced Blount to

renegotiate the contract with Andreco. Therefore, Blount has a claim in contract against Mobil for the cost of all of Andreco's "changes in the work" and a contribution claim for half of Andreco's acceleration damages.

tion and process steam tracing from distribution headers and return.

6. With regards to interface with Instrumentation Subcontractor, this Subcontractor shall install all first block valves off of piping, vessels, and equipment.

■ Except for the initially ambiguous "from—to" sentence, the subcontract shows a clear pattern of allocation. Sauer must install "all piping," including in-line instrumentation devices such as the distribution manifolds, and piping appurtenances to "interface" with Newtron's work such as "first block valves off of piping, vessels, and equipment." Newtron must install all other instrumentation devices. The "from —to" sentence fits this pattern perfectly if "to" is interpreted inclusively, which is a less common but perfectly acceptable meaning of the word. "From" is used inclusively in the same paragraph: Newtron is to install all instrumentation "from distribution headers and return." It is extremely awkward to read the subcontract to require Sauer and Newtron to supply all aspects of tubing and instrumentation except this one small item.

The district court apparently ruled that the contract was unambiguous because it made no findings about the intentions of the parties. We agree that it is unambiguous as a whole, but we disagree with the district court's interpretation. We hold that Sauer was required to supply the "distribution manifolds." Sauer's judgment against Blount should be reduced by $364,-496.85.

*F. Pre-judgment Interest for Newtron*

In its original Findings of Fact and Conclusions of Law, the district court held that Sauer and B & B were not entitled to pre-judgment interest. Blount had the right under the subcontracts to withhold a 10% retainage until it was paid in full by Mobil. Therefore, Blount did not owe pre-judgment interest, which is payable under

Texas law only for the *wrongful* detention of money. On appeal, these subcontractors do not contest this ruling. Newtron then requested pre-judgment interest, apparently for the first time, in a post-trial motion. This motion was denied on the same grounds as the earlier claims of Sauer and B & B.

Under Texas law, pre-judgment interest is awarded even on unliquidated sums when the principal damages are determinable and established at a definite time. *McDaniel v. Tucker*, 520 S.W.2d 543, 549 (Tex.Civ.App.—Corpus Christi 1975, no writ). Damages are usually considered fixed at the time of contract completion in construction cases. *Board of Regents, Univ. of Texas v. S & G Construction Co.*, 529 S.W.2d 90, 100 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.).

It appears from the record that Newtron was owed no retainage and had been paid in full by Blount. If that is true, it would be entitled to pre-judgment interest from the time of contract completion in April 1983. On remand, the district court should determine whether Newtron was owed any retainage. If the answer is no, the court should determine whether Newtron raised this issue for the first time after trial. If so, the court must decide whether it was proper to raise this issue at that time. If the answer is yes, the court should determine the proper amount of interest payable as damages and award it to Newtron.

*G. Computational and Clerical Errors*

Blount points to two errors in the judgment of the district court. First, in the Findings of Fact and Conclusions of Law, the district court awarded Blount $60,445 from Mobil for "spring hangers," of which $55,064 is to be passed on to Sauer. The judgment inadvertently awards Blount its mark-up of $5,381 twice rather than $5,381 to be retained and $55,064 to be passed on. Mobil agrees that this correction should be made.[11]

11. We have no idea were the $5,381 figure comes from. Blount's mark-up is supposed to be five percent or $2753.20. The district court seems to have awarded Blount everything but a five percent mark-up. The Judgment reads:
E. BLOUNT'S CLAIMS:

Second, Newtron dropped its claim for "additional overhead" in the amount of $122,010. It was nevertheless included in the district court's Findings and in the Judgment. Therefore, half this amount should be subtracted from Blount's liability to Newtron.

*H. Conclusion*

We affirm the district court's basic division of liability with the following modifications. First, Sauer must pay for the "steam tracing headers"; its judgment against Blount should be reduced by $364,496.85. Second, the parties agree that the judgment against Mobil in favor of Blount should be increased by $49,683, the difference between the cost of the "spring hangers" ($55,064) and the amount actually awarded Blount for these items ($5,381). Third, Newtron's judgment against Blount should be reduced by $61,005, half the amount for "additional overhead" erroneously awarded by the district court. Finally, we remand the issues surrounding the Andreco subcontract modification and Newtron's claim for pre-judgment interest to the district court for determinations in accordance with our opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

1. *Mark-ups:* The Court awards Blount its general contractor's mark-up (of 5 percent) for the following claims:

a.  Change order claim of $500,000 reasonably compromised by Mobil with Sauer (20 percent):
$100,000.00

b.  Andrew's [Andreco's] claim of $295,900.54 (25 percent):

$73,975.14

c.  The $55,064.00 claim in the cost of spring hangers [9.77 percent]:
5,381.00

Judgment at 3–4. None of the parties, however, disputes these awards so they are affirmed.